The following opinions were delivered:
By Mr. Justice Sutherland.
The question to be decided in this case is whether the assignment made by Grover and Gunn, on the 1st day of July, 1826, is fraudulent and void upon its face, as being calculated and intended, in judgment of law, to delay, hinder and defraud their creditors, in the prosecution and collection of their debts. The most important objection made to the assignment, grows out of the condition attached to the payment of the creditors named in class No. 2. The assignees are directed, after discharging the debts due to class No. 1, to apportion whatever surplus may remain, among such of those named in class No. 2 as will agree in writing under seal to receive what may fall to them upon such apportionment, in full discharge of all their claims and demands upon the assignors. The residue of the avails, if any, are then to be applied to the payment of the debts due to the debtors in class No. 3, and of all other debts justly due and owing by the assignors, to be proven to the satisfaction of the assignees; and if any surplus shall then remain, it is to be paid over to the assignors.
It was contended by the complainant in the court below, the respondent here, that such of the creditors in class No. 2 as shall refuse to come in and discharge the assignors, upon the terms there offered them, are entirely excluded from all benefit from the assignment; that if there should be a surplus after paying all the other creditors, according to the terms *and spirit of the instrument, the assignees could not pay it to them, but must pay it to the assignors themselves. Upon a careful consideration of this instrument, and applying to it the ordinary rules of interpretation, I do not think that such is its necessary or just construction. The debts of the first class are first to be paid; then an apportionment is to be made among the debts of such of the second class as will accept what may then fall to them, and give absolute releases. The residue, if any, is then to be applied to the debts of class No. 3, and to all other debts justly due and owing by the assignors. Other than what 1 Why, obviously, other than those for the payment of which provision had already been made. But no provision had been made for those of class No. 2, who should refuse to accept their distributive shares and give releases. They fall, therefore, in my opinion, within the terms of the residuary clause, and would be entitled to be paid under the assignment, if the fund should be sufficient for that purpose. A fraudulent intent is never to be presumed ; and where an instrument is ambiguous in its terms, and admits of two constructions, that interpretation should be given to it which will render it legal and operative, rather than that which will render it illegal and void. It was supposed that the provision that these residuary debts should be proven to the satisfaction of the assignees, tended to show that none of those enumerated in class No. 2 could have been intended to be covered by the residuary *195 clause, because the assignors had, on the face of the assignment, admitted those to be valid and existing debts ; and of course, if those were the debts intended to be covered, they would not have imposed on their assignees the useless duty of exacting and receiving proof in relation to them. 'This. suggestion is susceptible of two answers. In the first place, there may have been many other debts not enumerated, and in relation to which it would have been necessary and proper to require proof; and in a provision of this description, a party would naturally employ general and comprehensive terms, although they might embrace some cases in relation to which the provision was superfluous. But, secondly, upon adverting to the schedule, which contains #class No. 2, it will be perceived that many of the debts there enumerated, are stated by estimation only. Of the $34,000 embraced in that class, more than one fourth, or about $9000, are debts of that description. In relation to them, it was proper and necessary to exact proof, as there was no liquidation or admission of their amount; and in relation to those that were specifically stated in the schedule, the schedule itself would probably be suflicient evidence to justify the assignees in receiving them. I entertain no doubt, therefore, that under this assignment, such of the creditors of the second class as should refuse to accept their shares of the properly assigned in full satisfaction and discharge of their debts, were not absolutely excluded from the benefit of the assignment, but only postponed to a subsequent class.
Having thus settled the character and construction of the assignment, the question recurs, whether it is void on account of the condition on which it makes the preference given to the creditors of the second class to depend, to wit, an absolute discharge of their debts. It is perfectly settled, both in England and in this country, that a debtor in failing circumstances has a right to prefer one creditor or set of creditors to another, in all cases not affected by the operation of a bankrupt system. He may assign the whole of his property for the benefit of a single creditor, in exclusion of all others ; or he may distribute it in unequal proportions, either among a part or the whole of his creditors. No matter how or upon what principles the distribution is made, if the debtor devotes the whole of his property to the paymefit of just debts, neither law nor equity inquires whether the objects of his preference are more or less meritorious than those for whom he has made no provision. 3 Maule & Selw. 371. 4 Mason, 210. 5 T. R. 235. 6 id. 152. 8 id. 521. 4 East, 1. 2 P. Wms. 427. 1 Atk. R. 95, 154. 2 Johns. Ch. R. 283. 3 Johns. R. 71. 5 id. 385. 1 Binn. 502. 10 Mod. 489. 5 T. R. 424. 15 Johns. R. 583. 5 Cowen, 547. The right to prefer may originally have been sustained in part upon the supposition that just and proper grounds of preference did in most cases exist, and would be duly regarded by the debtor; but whatever may have been the reason or foundation of the rule, it is one of that numerous *clas's of cases in which the rule has become absolute, without any regard to the fact whether the reason on which it was founded exists or not in the particular cases. It is now too late to agitate the question, whether those assignments, either partial or general, are sustained by considerations of true wisdom and policy. Reflecting men have differed upon that subject ; but the better opinion seems to be, that in the absence of a general bankrupt system, the interests of a commercial community require that they should be sustained. They have accordingly grown into use, and have been sanctioned by judicial decisions in most of 'the states of the union. They have become thoroughly incorporated into our system ; and all that it is now competent for our courts to do, is to see that they fairly appropriate all the insolvent’s property, or such portion of it as he undertakes to assign, to the payment of his just debts, and are not made the *197 instruments of placing it beyond the reach of his creditors, and for the benefit, either immediate or remote, of the insolvent himself. Whenever they depart from the simplicity of a direct and unequivocal devotion of the property of the assignor to the payment of his debts, and contain reservations and conditions, intended for his ease and advantage, they are viewed with considerable, and I think I may add, in view of the course of judicial decisions in this state, with increasing distrust.
The precise question now presented to us has never been decided in this state. In Hyslop v. Clarke, 14 Johns. R. 458, Austin v. Bell, 20 id. 442, and Seaving v. Brinckerhoff, 5 Johns. Ch. R. 329, it arose in connection with other circumstances which had more or less influence in the decision of those causes. Hyslop v. Clarke, was an action of trespass, brought by the assignees of Barnet and Henry against a judgment creditor of the assignors, who had caused an execution to be levied upon their property notwithstanding the assignment. The plaintiff claimed the property under the assignment, and the defendants contended that the assignment was void, and did not pass the property out of the assignors. The trusts declared in that case were, 1. To pay a certain debt due to the assignees; 2. To pay all the other creditors of the assignors in full, if the property should be sufficient ; if not, *then rateably, provided they should severally and respectively discharge the assignors from all further liability for their debts ; but if the creditors or any of them should refuse to give such discharge, then the second trust was to become void, and the trustees were directed not to execute it. They were, then, 3dly, after paying the debt of Hyslop & Co., the assignees, to hold the residue in trust to pay the whole of the avails to such of the creditors of the assignors as they should appoint, as soon as such refusal should be known to them ; and 4. To pay the residue to the assignors. Here, as was remarked by Judge Van Ness, the assignment did not actually give a preference to'any of the creditors, except Hyslop & Co.; but it was an attempt on the part of the debtors to place their property out of the reach of their creditors, and to retain the power to give such preference at a future time, upon their own terms and conditions. The trust for the benefit of all the creditors ceased whenever any one of the creditors refused to come in on the terms prescribed, and the property was then held in trust for the assignors themselves ; and as the creditors could not reach it at law, if the assignment was valid, so Judge Van Ness held that they could not effectually reach it in equity. For if any one should file a bill to compel the assignors to make a new declaration of trust, as the power reserved was to select whom they pleased, if a decree should be made ordering a new declaration, the assignor might exclude the very creditor who had filed the bill. Under such circumstances, no creditor would ever file a bill. That assignment, then, differed from the one now under consideration in two essential particulars : 1. It reserved to the grantor a right subsequently to control the property by appointing new uses ; and 2. The power of any one creditor effectually and beneficially to compel such declaration, was exceedingly doubtful, if not impossible. The weight which these circumstances had in the decision of the cause maybe subsequently considered. The case of Murray v. Riggs. 15 Johns. R. 571, shows that the control over the property,which the assignor there reversed was of itself sufficient to avoid the deed. In Austin v. Bell, the assignment contained a reservation of $2000 per annum for a limited time to the assignor. It also exacted from the ^creditors who were to be benefitted by it a general release ; and then provided, that if any of the creditors named should not within a limited time become parties to the assignment, and thereby dis *198 charge the assignor, that the assignees should then pay to the assignors the proportion which would otherwise have gone to such creditors ; and it was on this ground principally, that the assignment in that case was held void. The provision for the grantors themselves, was then supposed to have been sanctioned by the court in Murray v. Riggs; and Ch. J. Spencer put his opinion mainly on the ground, that by the provision of the assignment, the shares of such of the creditors as should refuse to execute it, were to revert to the grantors for their own private benefit and use. In Seaving v. Brinckerhoff, the assignment also contained the condition that the creditors who should come in under it, should give a full discharge of their demands ; and if any of them refused, their shares were to be held in trust for the grantor. Chancellor Kent laid great stress in that case upon the fact that the assignment did not embrace all the property of the assignor, and yet exacted a release from his creditors upon a partial payment; he says the condition was oppressive, and without any color of justice in this case, inasmuch as the assignment was not general of all the property, but only of a specified part; a partial assignment upon such a condition is pernicious in its tendency, if it be not fraudulent in its design ; and in relation to the resulting trust, he remarked that a power of coercion over the creditor, with the reservation of such a resulting trust to the grantor in case the coercion should not be successful, was deemed by the supreme court, in Hyslop v. Clarke, to be a badge of fraud, and not a fair and lawful assignment.
But although it is not adjudged in any of these cases that an assignment is fraudulent and void, which merely makes the preference given to creditors to depend upon their releasing the grantor, but which at all events devotes the whole ¡rroperty to the payment of his debts without any reservation for his own private benefit; still it cannot be contended that they sanction, with any thing like the authority of a judgment, the contrary doctrine. I am inclined to think that the weight of professional opinion in this state has been in favor of the validity *of such assignments; but that, so far as it depends upon our own adjudications, the question is still open, and may now be settled by this court upon principle.
Very few cases are to be found upon this subject in the English books ; and whenever the question has arisen there, it has generally been upon composition deeds, to which the creditors were parties ; or has been more or less affected by considerations growing out of their bankrupt system. 4 T. R. 166. 8 id. 521. In the case, however, of the King v. Watson, 3 Price, 6, in the exchequer chamber, it must be conceded that the objection to the assignment which we are now considering, existed and was urged against its validity, and that the objection was overruled; there, however, as in the other cases, the principal question was whether the assignment was not void under the bankrupt laws. The case, however, is a very bald one, and is entitled to very little weight as authority. The opinion is exceeedingly brief, and refers to no cases.
This question has several times been under the consideration of the supreme court of Massachusetts ; but it has generally, if not always, been so connected with other objections to the assignment, that it is exceedingly difficult to say, upon a review of all those cases, what the judgment of that court would be upon the naked and insulated point which we are now considering. Hatch v. Smith, 5 Mass. R. 42. Widgery v. Haskell, 5 id. 144. Ingraham v. Geyer, 13 id. 146. Hastings v. Baldwin, 17 id. 552. Harris v. Sumner, 2 Pick. 129. Judge Story had occasion to consider those cases in Halsey v. Whitney. 4 Mason, 229, which was decided in October, 1826, and the conclusion which he deduced from them was, that this precise point was not directly decreed in *200 any of them. He observed that there were intimations in several of these cases, which would justify a doubt whether the court were prepared to admit the validity of such a stipulation, while in others which contained a similar provision no objection was taken to it by the counsel who argued them, or by the court in their judgment. His conclusion on the whole was, that the point was not judicially settled in Massachusetts. In that opinion he is sustained by Chief Justice Parker, who, in Borden v. Sumner, 4 Pick. 265, which was decided in the *same month with Halsey v. Whitney, obviously considered the question as still open, and declined expressing any definitive opinion upon the subject, as it was not necessary to the decision of the cause then under judgment. The subsequent cases of Andrews v. Ludlow, 5 Pick. 28, and Lupton v. Cutter, 8 Pick. 298 leave the question in Massachusetts still in the same state of uncertainty. The most that can be said is, that in several of the cases, although the assignment contained this provision, the objection was not taken either by the counsel or the court. Judge Ware, of the U. S. district court for the state of Maine, in the case of G. & I. Lord, libellants, v. The Brig Watchman, reported in the 16th No. of Amr. Jurist, 284, in a very elaborate and learned opinion, in which all the Massachusetts cases are referred to, also came to the conclusion that it was there still an open question.
In Pennsylvania, an assignment containing a stipulation for a release was sustained in Lippincott v. Barker, 2 Binney, 174. Judge Breckenridge, however, dissented, and Ch. J. Tilghman and Mr. Justice Yeates, whose opinions prevailed, took pains to put themselves upon the particular circumstances of the case. The Chief Justice observed, page 182, “ it being, however, to be distinctly understood that my opinion is confined to the circumstances of the present case ; for there are many and strong objections to deeds of assignment made without the privity of creditors, and excluding all who do not execute releases.” Vide also Burd v. Smith, 4 Dall. 76.
On the other hand, the supreme court of errors of Connecticut, in Ingraham v. Wheeler, 6. Conn. R. 277, pronounced an assignment fraudulent and void, solely on the ground that it confined the distribution of the property assigned, to those creditors who should give the assignor a discharge. It was the decisive point in the case, and was fairly met and decided by the court.
The same principle was also decided in Ohio, in Atkinson v. Jordan, 5 Hammond. Rep. 293.
In Pierpont v. Graham, 4 Wash. C. C. Rep. 232, Judge'Washington sustained an assignment containing this condition. In the district court in Maine, in the case already referred to, such a condition was held fraudulent. And Judge *Story, in Halsey v. Whitney, 4 Mason, 230, although he came to the conclusion with obvious doubt and hesitation, that the weight of authority was in favor of the validity of an assignment with such a condition, did not hesitate to declare that if the question were entirely new and many estates had not passed upon the strength of such assignments, the strong inclination of his mind would be against their validity. It is very clear that Judge Story, in coming to the conclusion that the weight of authority lay upon that side of the question, inferred it, as Judge Ware has expressed it, not so much from the authoritative decisions of the court, as from the silent acquiescence of the public ; not that it had been clearly settled, or distinctly recogninized by the judicial tribunals, but that it had slowly ripened into a rule of the common law of Massachusetts, by usage and custom.
There being, then, such a conflict among the authorities, and so much doubt on which side the preponderance lies, it seems to be not only proper but necessary to consider the question with reference to the general principles in *202 volved in it. Every conveyance of property to trustees is, to a certain extent, a hindering and delaying of creditors. It interrupts and presents obstacles to their legal remedies ; and every such assignment is absolutely void, if it does not appoint and declare the uses for which the property is to be held and to which it is to be applied. A provision that the uses shall be subsequently declared by the assignor will not do ; they must accompany the instrument and appear on its face, in order to rebut the conclusive presumption of a fraudulent intent, which would otherwise arise. But where the assignor parts with all control over the property, and devotes it absolutely to the benefit of his creditors, without any reservation or stipulations for his own advantage, the honesty of his intention is so apparent, and the advantage to the creditors so direct and decisive, that they cannot be said to be obstructed or delayed in their remedies. But where, instead of directly distributing his property among his creditors as far as it will go, he places it beyond their reach -by an assignment, not merely for the purpose of saving it from one particular creditor, to be given to another, or to be equally divided among all, but for *the purpose of ena-: bling him to extort from some or all of them, an absolute discharge of their debts as the condition of receiving a partial payment, he perverts the power to a purpose which it was never intended to cover, and which the principle on which the right to give preferences is founded, will not justify. Why should a debtor be permitted in this way to operate upon the fears of his creditors and coerce them into his own terms ? It has sometimes been said, in answer to this view of the case, that there is nothing immoral or unjust in a debtor in embarrassed circumstances and who is unable to pay all his debts, making the best arrangement in his power with his creditors, and giving the largest dividend or the whole, to those who will settle with him on the best terms ; and if he can do this while he retains his property in his own hands, there is no reason, it is said, why he should not be permitted to do it under the cover of an assignment. Parties not under legal disabilities, may make such contracts as they please; and if they are supported by a consideration, and there is no fraud in the case, they will not be disturbed. If a debtor, therefore, with his property in his own hands and open to the legal pursuit of his creditors, can satisfy them that it is for their interest or the interest of any of them to accept 25. 6d. in the pound, and give him an absolute discharge, there is no legal objection to it; they treat upon equal terms ; the ordinary legal remedies of the creditor are not obstructed. But the case is materially changed when the debtor first places his property beyond the reach of his creditors, and then proposes to them terms of accommodation. He obstructs their legal remedies, hinders and delays them in the prosecution of their suits, by putting his property into the hands of trustees, with the view of getting an absolute discharge from his debts, and exempting his future acquisitions from all liability. It has been decided in this court, that the reservation of the least pecuniary provision for the assignor or his family, renders an assignment of this description fraudulent and void. How much more valuable is a discharge from his debts, or a portion of them, to an insolvent debtor, than a temporary pecuniary pittance. Judge Van Ness, in Hyslop v. Clarke, states what I consider to be the *sound principle upon this subject. He says an insolvent debtor has no right to place his property in such a situation as to prevent his creditors from taking it, under the process of a court of law, and to drive them into a court of equity, where they must encounter expenses and delay, unless it be under very special circumstances and for the purpose of honestly giving a preference to some of his creditors, or to cause a just distribution of his estate to be made among them all. Judge Spencer, in Austin v. Bell, and *203 Chancellor Kent, in Seaving v. Brinckerhoff, obviously concurred in the soundness of that position. Judge Story expressed his approbation of it in Halsey v. Whitney. The supreme court of errors in Connecticut adopted it in Ingraham v. Wheeler, and it was most happily and impressively amplified and illustrated by the learned judge of the United States district court for the state of Maine, in the case to which I have referred.
It is time that some plain, simple, but comprehensive principle should be adopted and settled upon this subject. In the absence of a bankrupt law, the right of giving preferences must probably be sustained. Let the embarrassed debtor therefore assign his property for the benefit of whom he pleases ; but let the assignment be absolute and unconditional; let it contain no reservations or conditions for the benefit of the assignor; let it not extort from the fears and apprehensions of the creditors, or any of them, an absolute discharge of their debts as the consideration for a partial dividend ; let it not convert the debtor into a dispenser of alms to his own creditor; and above all, let it not put up his favor and bounty at auction under the cover of a trust to be bestowed upon the highest bidder. After the maturest reflection upon this subject, I have come to the conclusion that the interests, both of debtor and creditor, as well as the general purposes of justice, would be promoted, if the question is still an open one, by confining these assignments to the simple and direct appropriation of the property of the debtor to the payment of his debts. The remnants of many of these insolvent estates are now wasted in litigation growing out of the complex or suspicious character .of the provisions of these assignments. One device after another to cover up the property for the benefit of *the assignor, or to secure to him, either directly or indirectly, some unconscientious advantage, has from time to time been brought before our courts and received condemnation. But new shifts and devices are still resorted to, and will continue to be so, until some principle is adopted upon the subject, so plain and simple that honest debtors cannot mistake it, and fraudulent ones will be deterred from its violation by the certainty of detection and defeat. The priciple to which I have adverted, it appears to me, if adopted, will, to a very considerable extent, accomplish that object.
But there is another provision in this assignment which it appears to me, it is impossible to sustain. It is that which gives to the assignee full power and liberty to compound with all or any of the creditors in such manner and upon such terms as they shall deem proper, so, however, as not to interfere with or depart from the order of preference established in the assignment. The effect of this provision is, as is stated by the chancellor, to perpetuate the right of giving preferences by vesting in the assignees an arbitrary power in relation to these several classes of creditors, and of compounding with any one upon such terms as they may think proper. I do not see how any other construction can be given to it; it has repeatedly been decided that an assignment which does not declare the uses, but reserves to the assignor the power of subsequently doing it, is fraudulent and void; and as the assignor cannot reserve the power of giving preference to himself, he certainly cannot legally confer it upon his assignee ; the same objection in principle exists in both cases.
The next and only remaining objection to the assignment which 1 shall consider is, that it does not fix the time within which the assignees are to give notice to the creditors in class No. 2, to come in and execute the discharge and receive their dividend. After paying class No. 1, the assignees are to pay the surplus to such of the creditors in class No. 2 as shall, within three months from the time when thereunto in writing requested by them, agree to receive their dividend and execute a discharge. The chancellor seems to suppose that *205 the assignees, under this provision, may give notice to one of the creditors at one time, and to others at another time, and that *each must come in within three months after receiving his notice. When he first comes in, he must execute a discharge, although there is no certainty whether the others will be called upon, or that they will have an opportunity of coming in within a reasonable time. I should incline to the opinion that it was the duty of the assignees to give notice to all the creditors at the same time. But still, the objection remains that the time is not fixed or limited by the assignment, but is left to their discretion ; and that the creditors would have no remedy for an unreasonable delay on the part of the assignees, except by a resort to a court of equity. This objection does not strike me with as much force as it appears to have done the chancellor. Where there is nothing fraudulent or suspicious in the trust itself, and from the nature of the case, it is seen to be necessary that'some latitude of discretion in relation to it should be given to the assignees, I am not prepared to say that the circumstance, that there is no remedy for an abuse of that discretion, except by a resort to a court of equity, is sufficient to avoid the trust. To a certain extent, that may have been the fact in this. But where a matter, affecting the rights and interests of creditors, which might and ought to have been made definite and certain, is left to the discretion of assignees, different considerations arise ; and I should incline to the opinion that it would be fraudulent. It is unnecessary, however, to dwell upon this point, as I hold the assignment fraudulent upon other grounds which have been stated.
I also abstain from any discussion of the question, whether the debt of the Messrs. Beach, the creditors first named in class number one, was a debt due from the firm of Grover and Gunn, or was the individual debt, of one of them ; and admitting it to have been an individual debt, what influence it would have upon this assignment. It is an important question.which, I agree with the chancellor, ought to be settled in a case where^therq/is no dispute about the facts.
I am for affirming the decree below. ,
By Senator Eumonds. This is a contest between the creditors of Gróver and Gunn. The respondent claiming under a judgment and execution, and the other creditors appearing *here by the assignees and claiming under -the assignment. The assignees have expended a large amount of the trust fund in the payment of the debts owing by Grover and Gunn, and in the discharge of their duties under the assignment; and the respondent asks that the assignment shall be declared fraudulent and void as to him, and that he may be paid the amount of his claim in preference to the other creditors. The decree of the chancellor confirms the assignment so far as regards the past acts of the assignees, but vacates it so far as relates to the funds yet in their hands. In the former part of the decree, I accord with the chancellor ; and if he is right in the latter part thereof, the remaining fund must.be paid in satisfaction of the respondent’s debt, to the exclusion of the other creditors.
An equal distribution of a debtor’s property among all his creditors is particularly favored by courts of equity ; for it is a standing rule, that “ equality is equity.” This rule would seem to be violated, by giving to the respondent the preference he now seeks ; yet it can be justified upon a principle which pervades all our courts, to wit, that the vigilant, not the remiss and careless creditor, is entitled to their favor and protection. The respondent claims that the assignment, on which the other creditors rest for their satisfaction is fraudulent and void, and that therefore he, as the most vigilant creditor is now entitled to the avails of the debtors’ property ; and this is the whole question in the case.
*207 Fraud has been well declared to be a question of intent; for no man can justly be said to be guilty of a fraud by accident or mistake. Our statute, 2 R. S. 137, § 4, has declared that the question of fraudulent intent, in all cases arising under it, shall be a question of fact, and not of law ; and in order to ascertain whether this assignment is fraudulent under this statute, and void by force of its operation, we must look at the facts in our search for the intent. The appellants in their answer unequivocally deny any such fraudulent intention. This is responsive to the charge in the bill, and is conclusive upon the respondent, unless contradicted by the evidence. No proofs were taken, and consequently there is no evidence of that character out of the assignment and the *pleadings. There is nothing in the answer inconsistent with this denial, unless the assignment, which is part of it, shows that inconsistency ; consequently, we are to deduce the fraudulent intention as a legal inference from the assignment itself, and only from that. It might have been argued from the decision of this court, in Jackson v. Seward, 8 Cowen, 406, and from the provisions of the revised statutes, to which I have already referred, that it was not competent for this court to draw any such inference, and that the absence of fraudulent intention being established by the denials in the answer, we would not be at liberty to say that any such intention did in fact exist. If such was my own interpretation of the statute, I should not now be at liberty to assert it. This court has, during this term, in the case of Cunningham v. Freeborn, (videpost,) giving a different construction to the statute, and has ruled, and I think with manifest propriety, that notwithstanding such denial, we may look to other parts of the answer, and to the facts conceded therein, for evidence inconsistent with, and contradictory to such denial. Evidence spread out in an answer may be disproved by other parts of the answer ; and I can see no good reason why the question of fraudulent intention should furnish an exception. We are then by this rule to inquire, whether this assignment does bear upon its face such evidence of a fraudulent intent, as to overbear the denial of the appellants in their answer.
The first badge of fraud to which our attention was called, was the fact that the partnership property had been assigned to secure an individual debt of one of the partners. I do not understand this to be true in fact. Grover and Gunn, in their answer, aver that they were justly, fairly, and bona jide indebted to each and every one of the creditors named in schedule H., class No. 1. At the head of that class stands the debt to J. H. & E. S. Beach, which is alluded to by the counsel as an individual debt, on the strength of the remark made in that schedule, that the debt was for the endorsement of Grover’s notes. Again; G. and G. in their answer deny that by the assignment any payment is directed to be made, without a real, existing, actual and bona fide indebtedness and legal liability against them. And they further say that the *debt of the Beaches was a judgment against them. Take, this whole answer together, as we ought to do in order to give it full effect, and the inference is inevitable, that although the notes were signpd' only by one of the firm, yet they were given in the course of the partnership business, and both were legally and justly liable for their payment. These parts of the answer being in my view responsive to the allegations in the bill, are, in the state of this case, conclusive upon this point. But even if it were otherwise, and the Beach debt had been against Grover alone, it does not follow that the assignment is therefore clearly fraudulent, or indeed that the direction to pay that debt to an individual creditor was any badge of fraud. Such direction might as to partnership property be held void as to partnership creditors; but this would be on the principle that partnership property must first go to pay partnership debts, *209 and not on the principle that it was made with a fraudulent intention, and therefore void. It could hardly be deemed fraudulent for the debtor to assign his property to pay his debts ; yet he might so assign it, as to endeavor to give a preference which the law would not allow: and while it might be forbidden, because contravening a settled principle of mercantile law, it would by no means follow as a necessary, or, indeed, as it seems to me, a legitimate consequence, that he intended to defraud. I do not then, in this part of the case, discover any thing indicating such a fraudulent intention as to justify me in holding the assignment void.
Another badge of fraud much insisted upon was, that the assignment de layed creditors by placing the property in such a condition that it could not be distributed within a certain time. In all cases of assignments of this charac ter, and there are many confessedly legal and valid, some time must necessa rily intervene between the execution of the instrument and a distribution oí the property assigned. That time must be reasonable, and such as the circumstances of the case would justify. In one case, Murray v. Riggs, 15 Johns. 571, a year’s locking up of the property, was held not to be unreasonable, because some of the creditors lived in Europe. In another case Lippencott v. Barker, 2 Binney’s R. 174, four *months for the creditors to come in and assent was held not to be unreasonable. In the case of Pierpont v. Graham, 4 Wash. C. C. R. 232, Mr. J. Washington states the true rule, as I conceive it, that the object of the time taken, was to give the creditors time enough to learn all the facts of the case, and make up their minds ; and if a longer time was reserved than was necessary for this purpose, and in the mean time the property was to remain in the hands of an irrespon sible assignee, there would be evidence of fraud. Here the time was three months. The amount of assets and of debts was very large. The debtors lived at Auburn; the creditors principally in New-York; and a shorter time might with some propriety have been complained of, as hurrying the creditors to a decision without giving them a full opportunity of investigation. The locking up of the property during this period, is no such hindering of creditors as to indicate fraud. The property was protected not against them, but for their benefit and for an honest purpose. Not that it might be placed beyond their reach, but within their reach, so that they and no others might have the advantage to be derived from it. 4 Wash. C. C. R. 232. Burd v. Fitzsimmons, 4 Dall. R. 76.
Another alleged badge of fraud, was the power given to the assignees to compromise with the creditors, and to set over debts to them. If this power could properly be considered as paramount to the other trusts declared in the assignment, and to have binding force in preference to them, the allegation of a fraudulent intention in this clause, might be made with more force. But I conceive that this power is subordinate to, and to be exercised in conformity with the other parts of the instrument. The assignees could not rightly vary the preferences established in the deed, more especially after the creditors had, by signing, confirmed that preference. Any creditor might take the transfer of a debt or a particular sum in gross, without waiting for a final settlement of the trust; but he would have no right to more than his distributive share. By this construction of the instrument, we shall give effect to every part of it; a different construction must render nugatory some part of it. The former course is most within the line of our duty. In all cases of doubtful construction, we must adopt That which renders every part operative, for we are bound to presume that the grantor intended that every part-should be operative and that he never intended to put into it any thing which *210 would be nugatory, and therefore worse than useless. Such I understand to be the authority of the cases. 1 Gill. & John. 345. 3 Cowen, 284. Hence it follows, that in order to view this power of compromise as evidence of fraud, we are to construe the instrument in such manner as to render part of it inoperative, contrary to the fair interpretation of it, and in violation of a very salutary rule of law. This is going farther for the purpose of presuming fraud than I am willing to go.
The remaining, and in my view, much the most important allegation of fraud, is that growing out of the provision in relation to the creditors in schedule H. class No. 2. The chancellor has supposed that the creditors named in that class, who did not, within the time specified, release their debtors, were entirely excluded from any participation in the assignment, and that the debtors had thus created a very important condition to the creditors receiving any benefit from their property. If this was the true construction of this instrument, I should find no difficulty in agreeing with the chancellor in holding it void; but I do not so understand it. The first class consists of those who are named in it. No condition is annexed to their location ; they have nothing to do in order to procure entrance there. The second class is different. The person to be admitted into it must not only be named, in it, but he must execute a release of the debtors. Both these things are necessary to constitute a creditor a member of that class. Consequently all creditors who are named as belonging to that class, but who do not execute a release, are excluded from it. Those who do release, and are not named in it, are equally excluded. The third class includes certain specified creditors, and all other creditors of Grover and Gunn. Other than what? Other than those included in Nos. 1 and 2. I do not see that the assignment will admit of any other construction. It seems to me then to follow, necessarily, that a creditor named in the schedule H.. class No. 2. but who does not release equally with the creditor who does release, but is not *named, are excluded from the second class, and are included in the third class, as creditors other than those included in Nos. 1 and 2. If I am right in my construction, then the main ground fails, on which the opinion of the court below rests. And the most that can, with propriety, be said is, that it is doubtful whether it will not bear the construction put upon it by the chancellor. Conceding this to be true, we find that we are called upon to construe an ambiguous instrument, not so as to give it effect, but so that we may presume a fraudulent intention from it. This point being settled, the whole question is this, whether the debtor ought thus to use his right to prefer, and whether, if he does so, it is such a coercion of the creditor as will be evidence of fraud sufficient to avoid the whole assignment ?
Let us pause a moment, to view the operation of this assignment. Suppose that none of the creditors named in the second class should execute a release ; the effect would be that the fund remaining after the payment of the first class, would be divided, not between Grover and Gunn, but among all their other creditors, according to their respective claims. This would not surely be fraudulent. It would be simply a preference of certain creditors, which is legal, and an equal distribution among all the other creditors, which is that equality so deservedly cherished in courts of equity. Suppose that certain of the second class should sign, and others refuse, how would it vary the matter? No otherwise, that I can conceive, than simply increasing the number of preferred creditors ; and precisely the same would be the effect, if all of the second class gave releases. I do not see how any principle of law would be violated in one of these cases more than in the other. The result would be *212 simply to put it in the power of the creditors to increase the preferred class. Can this be fraudulent; and least of all, can it be such evidence of a fraudulent intent as to be conclusive in our minds ? This would be indeed extracting poison from the healthiest plants. In Hyslop v. Clarke, 14 Johns. R. 462, it was held that the debtor’s reserving the power of increasing the preferred class was fraudulent. Surely you cannot prove the same, by a directly contrary state of things ! The language, then, which this assignment, properly ^understood, puts into the mouths of Grover and Gunn, is briefly this : “We will give you a preference, if you will discharge us : if you will not, take all our property, and dispose of it as you please.” Or, in other words : “We are able to pay you half your debt—take that half, and release us. If you will not: take all we have—divide it among you, and hold us still liable.”
This is, in my view, the proper construction of this instrument. I am very unwilling to concede that this is forbidden by the law. If it is, the situation of the debtor must be very destitute of hope. We can, without any great stretch of the imagination, fancy cases in which a debtor may be overwhelmed with debt, beyond the possibility of liquidation, by the exhaustion of all he has, and at the same time he may feel the full force of that high and moral obligation of preferring some of his creditors, which the law has not only sanctioned, but applauded. What is he to do ? If he yields to the force of that obligation, and gives a just and deserved preference, our insolvent laws shut against him forever the door by which he might hope for a legal release. He cannot be permitted to use his right of preference as an inducement to his creditors to release him; he must rely solely upon their tender mercies. While he has his property under his own control, he has a right to pay which creditor he pleases, and obtain a release. He can give any one such a preference as to enable him to obtain satisfaction out of his propert)?, and he thus be released. Will his doing so to two or more be fraudulent 1 He may use his property, while yet in his hands, in compounding with his creditors, and buying a release. So far all is legal and just; yet, the instant he puts his property beyond his own control, and transfers it to his creditors for their benefit, his attempt to do either of these things is fraudulent, and his acts are void; and all this for carrying into effect an intention which the law permits, by means which the law applauds. If this is to be the law, I can fancy no inducement which a debtor, in failing circumstances, can have to save his property from the waste which always follows in the train of a forced sale of it. You make it his interest to violate the obligation he may owe to some of his creditors, *and to be dishonest, or at least careless of that property which can be no longer of any use to him.
I am aware that assignments of this character have been, and may very often be used as mere covers for gross frauds, and as means of carrying them into successful operation ; and that our courts have therefore regarded them with great jealousy, and manifested a uniform leaning against them. I do not mean to be understood as condemning this course ; on the contrarv, it meets my approbation, as a general rule. But it may be carried too far, and I cannot resist the conviction that such will be the result of our affirming the chancellor’s decree in this case.
The authorities have in no instance gone so far as we are now required to go, and we are therefore called upon to establish a new principle. The case of Hyslop v. Clarke, 14 Johns. R. 458, is the leading case in the courts of this state. There the creditors were to execute a release ; in case they did not, the fund was to be paid to such other creditors as the debtors should ap-
*214 point, and the surplus to be paid to the assignors. Now, in the first place, in that case, there was a resulting trust for the debtors, to the exclusion of the refusing creditors, which, of itself, was enough to avoid the deed. There is no such trust in the case now before this court. Nothing is to go to Grover and Gunn until all their debts are paid. In the next place, the creditors were to be entirely excluded, unless they released. The court said, upon this point, that it was not pretended that the assignment to Hyslop and Campbell was for the purpose of honestly giving a preference to some of the creditors of the assignors, or to cause a just distribution of their estate to be made among them all; but in this case both those things are pretended and clearly made out. An honest preference is intended, and a just distribution among all. None are excluded. The case of Murray v. Riggs, 15 Johns. R. 571, decided in this court in 1818, was cited by the chancellor, but not upon this point. There the trusts were to pay the debtor an annual sum for his support, and the creditors who should not in one year accept the conditions should be entirely excluded; yet the assignment was held to be valid. This case would go farther in supporting *an assignment than we can be asked to go to sustain this. In Austin v. Bell, 20 Johns. 442, the trusts were to pay the assignor a certain annual sum, and unless the creditors signed the instrument which contained a release of the debtors, the share of the refusing creditor should be paid to the assignors. The court decided that, as to the first trust, they were bound by the decision of Murray v. Riggs, and on the second trust the deed was void, because it was a reservation by the debtors, to their own use and benefit, of property which ought to have been appropriated to the payment of their debts ; and Chief Justice Spencer says that a deed which does not fairly devote the property of a person overwhelmed with debt to the payment of his creditors, but reserves a portion of it to himself, unless they assent to such terms as he shall prescribe, is in law fraudulent and void as against the statute of frauds. The cases of Seaving v. Brinckerhoff, 5 Johns. Ch. R. 329, and Burd v. Smith, 4 Dall. 76, recognize and adopt the same principle ; but they do not decide this case. Here the property of persons overwhelmed in debt is fairly devoted to the payment of their creditors ; here is no reservation to themselves of a portion, to the exclusion of any creditor; here is no exclusion of creditors from all benefit of the assignment, unless they comply with certain conditions ; here the debtor gains nothing by the creditor’s refusal to comply with those conditions. The case of Mackie v. Cairns, 5 Cowen, 579, decided in this court, is the only remaining case that I shall occupy any time in examining. The chief justice, in delivering the opinion of this court, uses this language : that “ a failing debtor is permitted to prefer in payment such creditors as he pleases. This is giving him power enough; but when he appropriates the property tohis°own use, the act. becomes fraudulent. Nor does it lie in his power to prescribe terms to his creditors. The law is open to them ; they have a right to pursue their debtor in the mode pointed out by the law, and any act which obstructs them in their pursuit is against law, and of course void, unless such act appropriates the property to the payment of debts. ” Here, then, is a plain and simple rule, easily understood and not difficult of being carried into effect, by which creditors may have the whole of the property of the *debtor, and he be unable to reserve from them any thing which fairly belongs to them. This, I think, is going far enough, and perhaps as far as we can go, without judicial legislation of an unusual character ; and this rule very much curtails the limits prescribed for such assignments by the case of Murray v. Riggs. Only a few steps more are necessary to destroy these assignments altogether. One of those steps we are now requir *215 ed to take. I am not prepared to do so. It is wise thus far to restrict their operation; they cannot be regarded too closely. But I am persuaded that their entire destruction would, in the absence of a bankrupt law, be productive of much more evil than could possibly accrue from the frauds which might be perpetrated under their cover, when bound down by the restrictions which we have already thrown around them, and when such facilities are afforded to enlightened and intelligent courts to pursue them to their most concealed recesses. The case of Mackie v. Cairns does not apply to the case before us, but the latter comes distinctly within the exceptions of the rule there laid down. Here is no appropriation of the debtor’s property to his own use; but there is an appropriation to the payment of debts.
Hence I have arrived at the conclusion that there is no fraud in fact in this case, and that no rule of law requires or would even justify us in inferring a fraudulent intention from the face of the assignment itself; and inasmuch as an intention to defraud must exist, in order to enable our statute to operate, this assignment is not void, because there was no intention in Grover and Gunn to defraud their creditors ; but on the other hand, an honest intention of appropriating their property for the benefit of their creditors. I have not examined the question whether this assignment was void by the common law, because, if it was, it would be void only in part; void only so far as relates to class No. 2. Therefore, after the payment of the first class, all the other creditors would come in for an equal distribution, and the assignment be good for that purpose. 20 Johns. R. 447. 5 Cowen, 564. I do not mean to be understood as saying that a debtor cannot so exercise his right of preference as to evince a fraudulent intention ; but I do not conceive that the exercise of that right in this case exhibits *any such intention, or that we can fairly draw from its exercise by these debtors any just presumption of a fraudulent purpose. Nor am I to be understood as questioning, in the slighest degree, the authority of Mackie v. Cairns. That case and the case of Austin v. Bell, in a great measure, overrule the case of Murray v. Riggs, and rightfully, I think. But I do not understand the case of Mackie v. Cairns as establishing any principle which requires that this assignment should be declared void ; it comes distinctly within its exception, and seems to me to be sanctioned by its doctrine. I go this length, and no farther, that the exercise of the right of preference, in the manner that Grover and Gunn have done in this case, is not of itself sufficient evidence, standing alone, of a fraudulent intention in them, to make void the assignment.
Having thus stated my reasons for differing in opinion with the chancellor, I will not attempt to deny that I have done so with some hesitation. One consideration, however, has had much weight with me ; there is not, in the whole case, anything to show that Grover and Gunn intended in fact to defraud their creditors ; but much to show that their real intention was to make a division of all their property among their creditors, reserving none to themselves. Such being the real and operative motive for this assignment, it seems to me that it ought to be liberally construed, to give it effect: that we ought not hastily to infer collusion, secret trusts, and meditated frauds ; but rather incline to sustain an instrument which purports to do that which the dictates of law and morality require of a failing debtor.
In my opinion the decree of the chancellor ought to be reversed.
By Senator Tracy. There would, I think, be little difficulty in sustaining this assignment, except for the provision in it that imposes, as the condition on which certain creditors shall be entitled to preference in the distribution of the assets, that they shall, within three months from the time'when thereunto re *217 quested, agree to receive such distribution in full discharge of their respective demands. I do not concur in the chancellor’s opinion, that the provision which authorizes the ^assignees to compound, forms a more objectionable feature than this, or even that it is so objectionable as to make the instrument void on its face. The argument against it only shows that in the exercise of this power, great abuses might be practiced ; but the same objection may be made with more or less force against every trust. At most, this provision affords only a presumption of fraud, and this presumption is sufficiently rebutted by the answer.
I consider the case, therefore, to involve only the inquiry whether an insolvent can insert in a voluntary assignment a provision which shall, either absolutely or contingently, secure for himself any other benefit or advantage except that of having his estate applied, so far as it will go, to the payment of his debts. The proposition which this inquiry involves has been much litigated; and conflicting, and perhaps equally respectable authorities are arrayed on the one side and the other. After the full examination which the chancellor has made of these authorities, it will not be necessary minutely to review them ; especially as, upon a careful consultation, I am persuaded that they are so equally balanced as to leave the present case as open for our independent determination as though the question it involves was now for the first time agitated. In Halsey v. Whitney, 4 Mason, 229, Lord v. Brig Watchman, No. 16 Law Journal, 284, and Atkinson v. Jordan, 5 Hammond, 293, the subject has been recently examined and ably discussed, and yet the decision in each case is under circumstances that deprive it of any controlling weight, and which leave us free to dispose of the question, on what we may consider its original intrinsic merits. It is in this view that I am disposed briefly to examine it.
Voluntary assignments, which enable a -debtor in failing circumstances to delay and defeat the diligence of particular creditors, by transferring his property to trustees of his own selection, is an invention, comparatively, of modern origin. I doubt if they have been known for more than forty or fifty years, at least I can find no case of their distinct recognition in the English courts, prior to 1805. It is true that a voluntary assignment by means of what is called a deed of composition, is of much older date. But this is a very different affair, *for the creditors are parties to this deed, and the assent of all of them is required to give it validity. Voluntary assignments have however, of late years been sustained by courts of law, and sometimes, I confess, under circumstances which I can hardly reconcile with my own notions of legal justice. But it will be found that in the first cases where such assignments are sanctioned, the courts were influenced entirely by the consideration that they operated to secure an equal distribution of the insolvent’s property among all his creditors. They saw that the principle of such assignments trenched upon a fundamental maxim of the common law, and was apparently repugnant to the very wording of the statute of frauds. But the rule of chancery that equality is equity, prevailed over the common law principle vigilanlibus non dormientibus leges subveniunt; and courts permitted the debtor to arrest the diligence of one creditor, in order to provide for the interests of all.
In one of the earliest English cases, Pickstock v. Lyster, 3 Maule, & Selw. 371, the validity of such an assignment is put wholly on the ground that it" effected an equal distribution among all the creditors ; and this circumstance induces Lord Ellenborough to remark, that “ such an assignment is to be referred to an act of duty rather than of fraud, when no purpose of fraud is proved. The act arises out of a discharge of the moral duties attached to the character of the debtor, to make the fund available for the whole body of creditors.” *219 Bayley, J. also observes, “ this conveyance so far from being fraudulent, was the most honest act the party could do—not having sufficient to satisfy all his debts, he proposes to distribute his property in liquidation of them.” In 3 Price, 6, Chief Baron Richards, commenting on the case of Pickstock v. Lyster, says, “ it was decided on the ground of the assignment being for the equal benefit of all the creditors.”
It is singular, when the right of an insolvent to lock up his property from the legal pursuit of one creditor by a deed of assignment was put on the principle of securing an equal distribution among all his creditors, that it was immediately extended, so as to embrace and combine with it, another and *a completely contradictory principle—that of preference among creditors. But so it is, that voluntary assignments, which were first allowed to prevent inequality in the distribution of an insolvent’s assets, are now resorted to as the most efficient means for securing this inequality. To prevent a rightful preference, the result of legal diligence, an act is tolerated which secures to the debtor a capricious preference vastly more unequal. Either principle—that of assignment or that of preference, standing by itself, might very well be questioned; but brought together, they form an unnatural coalition from which little that is salutary or honest can be anticipated.
I know that the right of preference is advocated by many enlightened jurists, on the ground that the debtor, possessing an intimate knowledge of the relative equities of his creditors, can make a more just distribution than the law. But there is apparently an inconsistency in the law’s denying the rightfulness of its own rules, and in its recognizing a difference between obligations which it has already decided to be equal. Besides it is anomalous that the law should defer its own wisdom and honesty to the wisdom and honesty of a delinquent party. The true reason why this right of preference has been allowed to the debtor is, that whilst the property is in his- hands unshackled of legal liens and encumbrances, his power over it is absolute, and as he can dispose of it by sale to any person, so he may dispose of it by way of satisfaction to any creditor ; and it is only by a bankrupt law, like that of England, that this control of a debtor over his own property can be arrested, except in cases provided against by the statute of frauds.
It is thought by some, that this right of preference favors commercial enterprise, by affording to those destitute of capital a credit founded on the power of securing confidential, at the expense of business creditors. If this be so, it is at best but a poor argument in its favor ; for it is founded obviously in wrong. The facility of obtaining credit under such circumstances is, in theory, nothing more than a facility of committing fraud, and in practice it has proved nothing less ; but it may well be doubted whether, on the whole, commercial credit is promoted by this right of *preference. There is certainly no reason why it should be ; for allowing that it enables a person to obtain endorsements or accommodation loans, founded on the confidence that his whole property is to be first appropriated for their discharge ; yet this very fact, it would seem, must operate to produce greater distrust and caution with his business creditors. But, however this may be, I am satisfied that the experience of all commercial communities leads to the conclusion that this power of preferring creditors is a fruitful source of frauds, and in every respect mischievous and unwholesome. Indeed the law of our state, though it tolerates, does not favor this preference. The legislature has discountenanced it, by denying the relief of our insolvent act to such debtors as have exercised it in contemplation of insolvency. If, therefore, it was a question arising now for the first time, whether an assignment by an insolvent which *221 contained a provision securing a preference to favored creditors was or was not against the policy of the statute of frauds, I should hesitate very much before I decided that it was not. But the question is not now open, having been repeatedly settled by our highest judicial tribunals, to whose decisions I yield a ready submission. But whilst I do this, I am disposed to go one line beyond the adjudged cases to uphold and extend a principle, the general influence of which I am persuaded is unjust and mischievous.
In the present case, we are asked to sustain an assignment which has not only secured an absolute preference to one class of the creditors, but also seeks to secure to the debtors themselves an important advantage, by offering a contingent preference to another class of creditors. This latter preference is on condition that the creditors last referred to, shall, within three months from the time when thereunto requested in writing by the trustees, agree by a writing under a seal, to receive such proportion of their debts respectively, as can be paid from the residuary avails, in full discharge of all their respective demands against the debtors. This appears to be a positive delay of this class of creditors, by placing the property out of the reach of their legal pursuit, and in a condition that it could not be distributed within any certain time, nor otherwise, except at the discretion of the trustees. It is no answer to say *that although no time is defined for the assignees to give the notice, yet the law imposes on them the duty of giving it within a reasonable time. The question of fraud is not to be settled by the simple fact that an ultimate remedy exists for the creditor : hut by the fact that the debtor has delayed the remedy for his own advantage. Here the creditors are to be delayed in receiving property which undeniably belongs to them the minute it comes to the hands of the trustees. For whose benefit is this delay? Not for the creditors, for they will get no more after they shall assent or refuse to assent to the condition proposed, than they would get immediately, if there had been no such condition. The delay is manifestly to benefit the debtors, in order that they may secure from it an advantage to which they have no rightful claim. Conceding it to be the true construction of the assignment, that if the creditors named in the second class refused to give a release, they were then only postponed to the subsequent class; still they were delayed at least for the time necessary to make the experiment, and this for no other purpose than that the debtors might have the benefit of the experiment. If the debtors had no right to lock up the property in the hands of their assignees until the creditors would execute releases, what right had they to lock it up in their hands until the assignees should choose to ascertain that the creditors would not execute releases ? The principle of the delay is the same in one case as in the other. If we throw out of view the preferred creditors of the first class and regard those of the third class in their true character, merely nominal creditors, the nature of the provision relative to the creditors of the second class may be more easily ascertained. In this view, the whole property of the insolvents would be locked up in the hands of the assignees until they should choose to ascertain whether every individual creditor would accept his share and give a release. For, until the final decision of every creditor was ascertained, no distribution could be made to any one of them. Grant that if all finally decided not to give a release, the whole property would then be distributed among them, the same as if no attempt to obtain a release had been made ; yet it is obvious that this distribution could not be made until after a long *delay; and a delay solely for the debtors’ benefit. The creditors could gain nothing by it, for at last they would get no more than they were entitled to at first. If the debtors had no right to insist on a release, as the condition alone upon which *222 their property should be distributed, neither had they a right to make a condition designed and calculated to procure a release. The law will not allow a person to accomplish indirectly what he is prohibited from doing directly. Upon every moral principle, the property of an insolvent belongs to his creditors ; and although the law tolerates him in distributing it among them according to his notions of right, yet it will not tolerate him in locking it up, in order that in its final distribution he may secure a future benefit to himself. In short, while the law permits a debtor to prefer one creditor to another, it will not permit him to prefer himself to any creditor.
It is said, however, that inasmuch as the the debtor, whilst the property is in his own hands, may legally stipulate with any particular creditors to turn over some part of it in satisfaction of his debt, therefore it is reasonable that he should be able to delegate the same power of compromising to his assignee. But the cases are different. In the one, he has not locked up the property by an assignment to the delay of his creditors, but keeps it openly in his own hands, exposed to the legal action of his creditors, up to the time that he disposes of it absolutely, in satisfaction of an existing debt. In the other, he puts it out of his hands for the very purpose of protecting it against the legal remedies of particular creditors, and then asks, not that its application to the payment of his debts shall be sanctioned, but that he may be allowed to keep it under cover, and out of the reach of legal process for a time, forasmuch as he does not design to keep it always under cover.
It is also said that as a debtor has the right to prefer such creditors as he pleases, he has consequently the right of preferring them on such terms as he pleases. But it does not follow, that because a debtor may make a present preference, he may also provide for a future preference, contingent upon some act of a creditor, beneficial to himself. Such a power in a debtor would nullify the statute of frauds, by leaving him at liberty to lock up his property until he had coerced his Creditors to such terms as he was pleased to dictate. The only ground on which the validity of voluntary assignments can rest is, that they contemplate nothing but a distribution of the debt- or’s property to his creditors, in some way. It may be by distributing it among all his creditors unconditionally, or if particular creditors are preferred, then it should go to them unconditionally, for the preference of one creditor to another should not be dependant on conditions to be performed, or on future contingencies, but must be a present preference, founded on circumstances existing at the time of the assignment. If a debtor be allowed to proceed beyond the single purpose of paying his debts, it is not easy to foresee at what point he can be arrested. The only safe rule is to regard every assignment which operates to delay creditors for any purpose whatever, not distinctly calculated to promote their interest, as contrary to the policy of the statute of frauds.
In this case, the real object of the provision in the assignment is not so much to afford a preference to particular creditors as to secure a release from them. And to this end it seems admirably adapted. It is contrived so as to create a scramble among the creditors ; and a scramble under such circumstances that its natural result will be an unjust advantage to the debtors. It takes away from every creditor the power of acting in the premises according to his individual wishes and judgment, and makes his final course dependant on the course adopted by every other creditor. It is true, if all concur in refusing to release, that they will ultimately be put on an equal footing ; but that they will concur cannot be known, for each is called on to decide for himself, without knowing what will be the decision of the others, at the same time that a knowledge of that decision is indispensable for his own safe judgment. And why is all this *224 perplexity and embarassment to be suffered ? Not for the pupose of effecting a just distribution of the estate, but for that of securing by its skilful distribution an important advantage to the debtors. Is this advantage which a debtor may rightfully attempt to secure by the assignment of his property ; or is it one to which in equity and good conscience he is entitled ? It seems to me that this inquiry carries with it its own answer. The law does not recognize any right, on the part’of an insolvent *debtor, to an absolute discharge from his creditors, on distributing among them his estate. One who contracts a debt, agrees not merely that he will pay it, if his presentproperty is sufficient, but also if his future exertions shall give him the power. In short, he pledges but the property he possesses and his capacity to acquire property. It is not true that parties have in view only the property in possession, when the contract is formed, or that the obligation of indebtedness does not extend to future acquisitions.
The prospect of an inheritance frequently forms a leading inducement to credit, and industry, talents and integrity constitute a fund which is as confidently trusted to as property itself. There is not a country in the world where a debtor, by his own act, can compel his creditors to take his property, and discharge him from his indebtedness. The cessio bonorum of the Roman law, which greatly mitigated the severity of the ancient law, by releasing the debtor who delivered up his estate to his creditors from a degrading servitude, did not operate to extinguish the debt. His subsequent acquisitions, with some exceptions, were liable until his debts were fully paid. ' This also is the principle of our laws to relieve debtors from their liability to imprisonment. The law commonly called the two thirds- act is on a different principle. But an insolvent debtor cannot obtain the benefit of this act, without the concurrence of a large majority of his creditors ; nor then, without incurring high legal responsibilities, and subjecting himself and his transactions to severe judicial scrutiny. But if assignments like the one under consideration are encouraged, insolvent debtors will be able, without incurring the expense and perils of judicial proceedings, to coerce a full discharge from their creditors, though no part of them freely concur in it; and this too without an oath, or in any other way affording to their creditors an opportunity to show that they are not dealing honestly and fairly.
In my view the right, either legal or moral, of a debtor to provide in his assignment for a release from debts which he has not paid, stands on no better ground than a right to secure from his creditors a return of a certain per cent-age on the property distributed, or an engagement that his creditors shall *give him a new credit. If either of these had been imposed as the condition on which the creditors named in the second class were to receive a distribution, there would seem to be no doubt of the assignment’s being void, within the principle of cases already adjudged. Indeed, I think this case closely approximates the principle of that of Hyslop v. Clarke, 14 Johns. R. 458. There all the property was to go ultimately to the creditors, or to some of them. No part of it was to come back to the debtor, in any event. He only reserved the right, in case all his creditors would not accept it in full discharge of their debts, to appoint the particular creditors to whom it should be distributed ; and this appointment to be made as soon as any creditor should refuse to accept and release. The objection to that assignment was, that it did not actually give a preference, but was in effect an attempt on the part of the debtors to place their property out of the reach of their creditors, and to retain the power to give such preference at some future time. In the present case, the objection is that the assignment does not actually give a preference to the *226 creditors in class number two, but proposes to give it at some future time, on condition that they will do an act beneficial to the debtors. If, in Hyslop v. Clarke, the assignment, instead of reserving to the debtors a contingent power of appointing the ultimate distributees, who were to take the property in case all the creditors did not agree to release, had actually designated them, it would not, as I perceive, have any the less placed the property out of the reach of the creditors, with a view to a preference at a future time. It certainly would have been no less coercive on those creditors who were to receive a distribution on condition of executing a release In both cases the debtors seek to continue their control over the property after it is assigned, for the purpose of so wielding it as to coerce their creditors, or some of them, to pay a consideration for that which, in justice and good conscience, already belongs to them.
Another point made by the appellants is, that if this provision of the assignment is illegal, yet, as the answer denies any intent to defraud, it is bad only by the common law, and is not void under the statute; and consequently that the remaining parts of the assignment should be sustained. This *distinction cannot be supported in the present case. The statute of frauds refers to a legal, and not a moral intent; that is not a moral intent as contradistinguished from a legal intent. It supposes that every one is capable of perceiving what is wrong, and therefore, if he do what is forbidden, intending to do it, he will not be allowed to say that he did not intend to do a forbidden act. A man’s moral perceptions may be so perverted as to imagine an act to be fair and honest which the law justly pronounces fraudulent and corrupt; but he is not therefore to escape from the consequences of it.
Some debtors may sincerely believe it morally right to conceal a part of their property for the support of their families ; others that they should exact a discharge from their debts, on giving it all up. But the law must have a more certain standard for measuring men’s intents, than each individual’s varying and capricious notions of right and wrong. It judges men’s motives from their actions, for it cannot enter into the recesses of a man’s conscience and interrogate his intents. In this case, although the debtors intended by their assignment so far to delay and embarrass their creditors as to induce them, on receiving a small part of their claims, to release the residue, yet doubtless they did not intend to do what they supposed the law would pronounce fraudulent, much less what would defeat the whole purpose of their assignment; and this is what I understand them to mean in their answer, by denying that “ the assignment is fraudulent in law, or made with a fraudulent intent.” In short, I see no reason for making this case an exception to the well settled rule, recognized distinctly in Mackie v. Cairns, 5 Cowen, 548, that a deed, void in part as being void against creditors, is void in whole; and I am therefore for affirming the chancellor’s decree.
After the several opinions delivered in the cause had been read, Mr. Justice Sutherland proposed the following resolution for adoption : “ Resolved, that the assignment is void, because it makes the preference given to the creditors of the assignors, designated as class No. 2, to depend upon the condition *that the preferred creditors shall give the assignors an absolute discharge of their debtsand on the question being put, “ Shall this resolution be adopted ?” the members of the court voted as follows :
In the affirmative—The President, Ch. J. Savage, Justices Sutherland and Nelson, and Senators Armstrong, Beardsley, Conklin, Cropsey, Deitz, Lynde, Macdonald, Sherman, Stowey, Tracy, Van Schaick—15.
In the negative—Senators Edmonds, Gansevoort, Griffin, Sudam, Westcott—5.
*227 And the court accordingly affirmed the decree of the chancellor, the final vote being the same as on the passage of the resolution.
Counsel were heard on the question of costs—Mr. S. A. Foot, for the respondent, contending that the appellants ought to be individually made responsible for the costs of the appeal, and Mr. J. C. Spencer insisting that the costs should be paid out of the funds in the hands of the assignees. A very considerable difference of opinion upon this subject existed among the members of the court, and on a resolution offered “ that the costs of the appellants and respondent, both in this court and also in the court of chancery, up to the time of the filing of the appeal, be paid out of the funds in the hands of the assignees,” the members voted as follows :
In favor of the resolution as to costs—The President, Chief Justice Savage, Mr. Justice Sutherland, and Senators Bishop, Cary, Conklin, Edmonds, Foster, Lansing, Livingston, Lynde, McDowell, Maison, Stow-er—14.
Against the resolution—Mr. Justice Nelson, and Senators Cropsey, Gan sevoort, Griffin, Hasbrouck, Macdonald, Sudam, Tracy, Van Schaick, Wbstcott—10.
So the decree of the Chancellor was affirmed, with costs to be paid from the fund in question.